WEBER v. BARNSDALL, *et al.*

Nos. 2505, 2506.   Opinion Filed April 4, 1913.

Rehearing Denied September 2, 1913.

(134 Pac. 842.)

1.  **APPEAL AND ERROR**—Reference—Findings of Master.   Under the law in force in the Indian Territory prior to statehood, the findings of a master upon matters referred to him by agreement of parties was entitled to the same weight as the verdict of a jury.

2.  **SAME.**   A case pending at statehood on the Indian Territory side of the state is governed by the same law as would have governed had there been no change in the form of government, and the findings of a master or referee, appointed after statehood, as to matters submitted to him by agreement of the parties will not be disturbed, if reasonably supported by the evidence.

3.  **INJUNCTION**—Relief—Jurisdiction to Cancel Contracts.   Where a plaintiff alleged that defendant was threatening to remove him from the possession and control of certain property on which defendant had drilling contracts, and upon which he had employed plaintiff to drill, and prayed for an injunction to restrain the defendant, and the defendant by cross-petition alleged that plaintiff was conducting the operations in an incompetent, extravagant, and negligent manner, and prayed that he be enjoined from interfering with defendant's possession and control, an issue was presented which authorized the court to adjudge plaintiff's employment at an end, if the facts justified such a judgment.

4.  **MASTER AND SERVANT** — Termination of Employment — Adverse Interest of Employee.   Plaintiff had been employed by defendant to do certain drilling.   He brought a suit against the defendant, asserting an interest adverse to defendant in the property to be drilled.   He also became general manager of a company which owned the leases under which defendant was to drill, and which was interested adversely to defendant as to the extent and character of the drilling.   **Held,** that he thereby terminated his right to continue in the service of the defendant.

5.  **CONTRACTS**—Breach of Contract—Damages.   After the plaintiff brought suit, he purchased practically all of the stock in a company owning leases under which defendant held drilling contracts, and upon which defendant had employed plaintiff to drill.   Defendant made application for a receiver for the property on which the drilling was being done.   Both plaintiff and the Company opposed the appointment of a receiver, and the application for a receiver was denied, and the plaintiff permitted to remain in pos-

session upon condition that he and the Company both give bond to defendant. **Held,** that the Company could not recover for failure to develop property, while plaintiff remained in possession.

(Syllabus by Rosser, C.)

*Error from District Court, Washington County;*
*T. L. Brown, Judge.*

Action by Howard Weber against Theodore N. Barnsdall and the Coon Creek Oil & Gas Company, and cross-action by the Coon Creek Oil & Gas Company against Theodore N. Barnsdall. Judgment for defendant, Theodore N. Barnsdall, and plaintiff, Howard Weber, and the defendant, the Coon Creek Oil & Gas Company, bring error. Affirmed.

*William J. Breene* and *Burdette Blue,* for plaintiffs in error.

*Jas. A. Veasey, Lloyd A. Rowland,* and *L. G. Owen,* for defendant in error.

Opinion by ROSSER, C. This was an action by Howard Weber against Theodore N. Barnsdall and the Coon Creek Oil & Gas Company, and a cross-action by the Coon Creek Oil & Gas Company against Barnsdall. For convenience Theodore N. Barnsdall will be referred to as Barnsdall, and the defendant, the Coon Creek Oil & Gas Company, as the Company. The plaintiff and the Company filed separate appeals; but the cases are considered and decided together.

Plaintiff claims that for some time prior to the 6th of April, 1905, he had been engaged in the oil and gas business, and that he had peculiar skill and ability in locating and acquiring leases and drilling contracts for oil and gas in the Cherokee Nation; that by reason of his skill and competency, and as a result of personal investigation and expenditure of time and money, he became convinced that a large oil and gas field lay between Tyro, near the Kansas line, and the city of Bartlesville, and that he had taken certain holdings and drilling contracts known as the Stubbs & Low drilling contracts, and was arranging for other contracts in that field; that Barnsdall, learning of his skill and ability, and his competency to carry out his plans, offered to

finance the business for the plaintiff, and to carry for the plaintiff a one-eighth interest in all the holdings, leases, and drilling contracts obtained through plaintiff's efforts, the one-eighth interest to become fully vested and deliverable to plaintiff when the profit on the particular leases exceeded the reasonable and necessary investment of Barnsdall; that Barnsdall proposed that all leases and contracts should be taken in his, Barnsdall's, name, and that he would hold the same for his and the plaintiff's mutual benefit; that plaintiff should be placed in control and possession of the developments of the property in connection therewith that was not then in contemplation or might thereafter be acquired, and proposed further that plaintiff should have all the drilling and cleaning out and other work to be done on the leases at certain agreed prices, and proposed that in all things he, Barnsdall, would co-operate with the plaintiff in the development and operations under said holdings and drilling contracts. Plaintiff further alleges that he accepted the offer and proposition of Barnsdall, and relying upon the contract he obtained certain drilling contracts in the name of Barnsdall, among others the one known as the Stubbs & Low contract, and one known as the Coon Creek Oil & Gas drilling contract; that he gave the operations and development for oil and gas under said drilling contracts his continuous, faithful supervision and control; that prior to the institution of this suit, Barnsdall unlawfully repudiated and denied *in toto* the contract alleged, except as to these called Stubbs & Low drilling contracts; that Barnsdall has received large sums of money on account of said operations and development of the property, for which he should account, but for which he has failed and refused to account. The petition further alleges that certain leases had paid out, and the proceeds thereof had exceeded the investments therein made by Barnsdall, and that the other leases or drilling contracts will pay out if allowed to remain under plaintiff's supervision and control. The petition further alleges that Barnsdall has unlawfully and fraudulently sought, endeavored, and threatened to remove the plaintiff from the control and supervision of the holdings and drilling contracts, and is still threatening to do so; that Barns-

dall and plaintiff have never had a full settlement and accounting of all the matters between them. The petition further alleges that Barnsdall has fraudulently misappropriated money which belonged to the parties jointly; that he has permitted large accounts to mature and remain unpaid for the purpose of freezing the plaintiff out of the business; and that he has refused to permit the development of the properties. The petition prays for a decree declaring plaintiff to be the lawful owner of one-eighth of the leases, holdings, and drilling contracts, and that Barnsdall be compelled to execute all necessary written instruments to make the decree effective, that an accounting be had between the parties, and that Barnsdall be enjoined from incumbering or selling, or in any manner disposing of, the property in which plaintiff claims an interest.

The defendant, Barnsdall, in his answer denies generally and specially that the plaintiff is the owner of any interest in the leases and drilling contracts taken in defendant's name. The answer further alleges that the plaintiff conducted the operations on the land in an incompetent, extravagant, and negligent manner; that he has let contracts for drilling and for operations on said lands to associations, partnerships, or corporations in which he was secretly and largely interested, either as a silent partner or stockholder, and that such contracts were let at prices above what the work provided therein was reasonably worth, or could be obtained in the neighborhood from other parties; that he placed his relatives and members of his family upon the pay rolls of said mining operations, paying them large and exorbitant wages and salaries. The answer pleads other matters in defense not necessary to be set forth under the view that is taken of the facts of this case. The answer concludes with a prayer for an injunction restraining the plaintiff from interfering with the mining appliances or property belonging or appurtenant to any of the wells or mines drilled on the lands described, and that Barnsdall be adjudged to be the owner of all the machinery, appliances, and property connected with or belonging to or appurtenant to such mines or wells, and also all the money in the hands of the Coon Creek Oil & Gas Company.

Barnsdall also filed a cross-petition against the Coon Creek Oil & Gas Company, in which he alleged that it had in its custody and possession about $40,000 belonging to him; that on account of its wrongful withholding of said sum of money he has been unable to pay bills accruing against the drilling operations; that he is advised that the company has paid said accrued bills, and intends to take possession of the lands on account of his failure to pay the bills. The cross-petition concludes with a prayer for an accounting, and that the company be required to pay him the amount due, and for other proper relief.

The Company answered the petition, admitting that it made a contract with Barnsdall, and stating that it knew nothing of the contract between Weber and Barnsdall, and stating, in substance, that it was willing to pay the money in its hands to the person entitled. Later it answered the cross-petition of Barnsdall, and alleged that Barnsdall, without legal cause or excuse, and in violation of his contract, refused and failed to pay bills for drilling, clearing, developing, and equipping the wells upon the leases, and that a large amount of money remained unpaid for a long time, and notified all persons furnishing labor or material in and upon the leases not to furnish any more upon his contract, and that it, the Company, for the purpose of protecting these leases against suits, and for the purpose of satisfying the persons who had, in good faith, furnished labor and material, paid divers persons the amount due them for said work and material. The answer further alleged that by its contract with plaintiff it was agreed that plaintiff would do no act whereby it might be injured or the leases forfeited; that he agreed to drill the wells by the rules and requirements of the Secretary of the Interior, and further agreed that if oil was found in paying quantities in any well he would, with due diligence, drill other wells so as to fully develop all of said wells, and agreed to offset all wells which were drilled at a distance of 300 feet or less from the line of leases. The answer further alleged his failure to comply with these conditions, and failure to pay the amount due for drilling, and prayed for damages for said failure.

Barnsdall replied to the answer of the Company, and alleged that he had complied with the terms of his agreement, and alleged that all bills would have been paid if the Company had paid him the amount due him, as it was its duty to do; that the Company and the plaintiff have connived together to withhold moneys due him, and have diverted them to the use of the plaintiff; that the plaintiff has grossly mismanaged the operation of the leases, and has managed them in a negligent, extravagant and imprudent manner.

The plaintiff filed a reply to the answer and cross-petition of the defendant, in which he denied generally and specially all the material allegations of the answer and cross-petition. To these various pleadings were attached exhibits, consisting of contracts, descriptions of property, statements of accounts, and other voluminous matters, making them almost interminable.

Soon after the suit was brought, an injunction was issued, and, among other things, Barnsdall was enjoined from interfering with the possession of Weber until the further order of the court. A few days later Barnsdall made application for a receiver, and a special master was appointed to hear the application for a receiver. He recommended that no receiver be appointed, but that Weber be allowed to remain in possession upon giving bond. Weber, so far as appears, has had exclusive possession of the property ever since.

Afterwards the parties entered into a stipulation by which it was agreed that Henry H. Montgomery be appointed special master or referee to find and report all the facts in controversy, material to the issue or issues raised by any of the pleadings filed or to be filed; that he also have power to find and report the law applicable to the facts so found.

The referee filed a report in which he made 25 findings of fact. The seventeenth finding is the one that is seriously challenged by the plaintiff. It is as follows:

"That during the month of March, 1905, the plaintiff, Weber, and the defendant, Barnsdall, had a conversation on the train between Bartlesville or Dewey, Okla., and Tyro, Kan., in which conversation the situation, prospects, and conditions of the oil business in the locality heretofore mentioned in these findings was

discussed by them. The evidence discloses that this was the first meeting between the plaintiff, Weber, and the defendant, Barnsdall, and that they had not theretofore been personally acquainted with each other. It further discloses that an arrangement or agreement was talked over by them providing, among other things, that the plaintiff, Weber, would procure some drilling contracts or mining leases, holdings, or interests on and in lands in the territory mentioned, for Barnsdall, and that Barnsdall would, if the same were satisfactory to and accepted by him, furnish the money to develop the leases thus obtained for oil and gas purposes, and would employ the plaintiff, Weber, to do the drilling and operating upon the lands so obtained. The plaintiff claims that, in this conversation and later negotiations had soon thereafter, it was agreed that he should have, in addition to the management, control, drilling, and operating thereof, a one-eighth working interest therein after the leases should have paid out. On this particular point as to whether there ever was an agreement of this character the evidence is hopelessly conflicting. From all the evidence in the case it cannot be found by a fair preponderance of the evidence that a definite arrangement, contract, or agreement was ever definitely entered into by and between the plaintiff, Weber, and the defendant, Barnsdall, and also understood by each of them, whereby the plaintiff, Weber, was to have an interest in the lands so obtained for Barnsdall, or the leases or contracts thereon. It is therefore found that the plaintiff has not shown by a fair preponderance of the evidence that an oral agreement was entered into between the plaintiff and the defendant, Barnsdall, under the terms of which the plaintiff, Weber, was to receive definite or determinate interests in the drilling contracts, and the oil and gas mining leases mentioned in plaintiff's petition."

Following the report of the referee, it was adjudged and decreed that the prayer of plaintiff's petition be denied except as to the accounting; that the prayer of the defendant, the Company, be in all things denied; that the plaintiff have an undivided one-eighth interest in the drilling contracts; that the plaintiff and the Company, and each of them, and all persons acting through or under them, be restrained and enjoined from interfering with or in anywise hindering the defendant, Theodore N. Barnsdall, or his legal assigns, in the peaceable possession and quiet enjoyment of the oil and gas mining leases described, from removing or attempting to remove any personal property from the

land and leases used in connection therewith, and the operation and development for oil and gas mining purposes, except property owned by the plaintiff, Weber, in his own right, also enjoining them from hindering or obstructing the defendant, Barnsdall, in collecting 83 1-3 per cent of the proceeds realized from the sale of oil and gas from the leases mentioned; that a complete accounting be taken; and that the Company be required to pay Barnsdall 83 1-3 per cent of the money received from the operation of the leases.

A number of questions are raised in the appeal. The principal contentions on the part of the plaintiff are: First, that the seventeenth finding of the referee is not supported by the evidence. Second, that the court erred in enjoining the plaintiff from proceeding under the drilling and cleaning out contract with Barnsdall, and by adjudicating adversely his rights thereon. Third, that the master and the court erred in finding that the Coon Creek Oil & Gas Company was not entitled to damages against Barnsdall on account of his failure to develop the leases.

This case was pending at the time of the admission of the state into the Union. The case, therefore, was governed by the law in force in the Indian Territory prior to statehood. *M., K. & T. Ry. Co. v. Walker,* 27 Okla. 849, 113 Pac. 907; *Pacific Mutual L. Ins. Co. v. Adams,* 27 Okla. 496, 112 Pac. 1026; *Swift v. Coulter,* 28 Okla. 768, 115 Pac. 871; *Choctaw Electric Co. v. Clark,* 28 Okla. 399, 114 Pac. 730; *Border v. Carrabine,* 30 Okla. 740, 120 Pac. 1087. Under that law, where parties agreed to a reference, the findings of the master as to all matters within the agreement were entitled to the same weight as the special verdict of a jury, and could not be disturbed if any evidence in the case reasonably tended to support them. *Hope v. Bourland,* 21 Okla. 864, 98 Pac. 580; *Town of Sapulpa v. Sapulpa Oil & Gas Co.,* 22 Okla. 347, 97 Pac. 1007; *Locust v. Caruthers,* 23 Okla. 373, 100 Pac. 520. The stipulation under which the master was appointed in this case provided that he should find and report all the material facts in controversy within the issues as made by the pleadings then on file, or afterwards to be filed. It follows that if his findings are reasonably supported by the evidence they

should be sustained.   It is not the duty of the court to examine the evidence with a view of deciding for itself where the weight of the evidence lies, but merely to ascertain whether there is evidence supporting the finding.

A greater portion of the brief of plaintiff is taken up with the argument of the proposition that the seventeenth finding of the referee was not a finding at all, but if it did amount to a finding it was not based upon evidence reasonably tending to support it. Probably the result arrived at in the finding could have been expressed in more direct language.   It would have been better to say that upon the issue the referee found in favor of the defendant.   It was not incumbent upon the referee to give his reason for such finding, except as an aid and guide to the court when it came to hear the testimony.   The referee simply undertook to point out why he found for the defendant.   He shows that the evidence is hopelessly conflicting, and that therefore it cannot be found by a fair preponderance of the evidence that the parties entered into any definite contract or agreement; that the plaintiff has not shown by a fair preponderance of the evidence that an oral agreement was entered into, under the terms of which plaintiff was to receive a definite interest in the drilling contracts or the oil and gas mining leases.   This amounted clearly to a finding for the defendant.   It amounted to saying that the plaintiff has not proved his case.

Upon the proposition that the finding is not supported by the evidence, plaintiff contends:  First, that there was a contract made between the parties at their first meeting on the train, which has been partly performed, and therefore is not within the statute of frauds; and, second, that Barnsdall knew Weber thought there was a contract, and, having permitted Weber to go on in that belief, he is estopped to deny the contract.   He urges that a finding against either of these contentions is not supported by the evidence.   It is hard to state, within any reasonable compass, why the finding is correct.   The record of this case amounts to more than 1,500 pages, and the briefs, if such a name should be given to documents so formidable, amount to more than 900 closely printed pages.

Barnsdall testified positively that he made no such contract as claimed by plaintiff. There is nothing in his letters which indicate a contract, such as claimed by plaintiff; neither is there anything in them which will raise an estoppel, as contended for by the plaintiff. On the other hand, Barnsdall's letters, almost without exception, indicate that he claimed the entire property. In a letter of December 3, 1905, he says:

"If I cannot go down there before long, I am going to send for you to come here, as I want to look my leases over and see just what I have and what I have to do."

In a letter of November 18, 1905, he says:

"You get a nice well for me east of Dewey, and I think would start some more in there, but go at least five hundred feet apart."

On the 11th of December, 1905, he writes:

"I have written you a number of letters in regard to that well that is blowing away. Now I want you to get Degolier started to packing that well at once. If you have not started packing it, and can find some one with a drilling machine to pack it with a three-inch pipe, and I want this done at once. I have written you several times about this, and I get a telegram from you saying that it was packed and not leaking from the gas sands; but as I just saw a man that came from there I know it is not packed and I want it done at once."

On the 9th of January, 1906, he writes:

"Mr. W. J. Young will be out to look at my property, and I want you to show it to him. Also show him all the dry holes. He has stopped working for the Standard, and wants to buy some productions."

On the 13th of March, 1906, he writes:

"This will introduce to you Mr. W. J. Young, who has taken charge of all my properties for me, and you will get your instructions from him from now on."

On the 10th of April, 1905, Weber writes:

"I note what you say regarding your nephew, and I am sure we can arrange matters satisfactorily regarding that and the other matters, but merely suggested in my letter to you what I considered a fair proposition subject to your ideas of it. If you are satisfied with the stuff, and the contracts do not let any fear of any arrangements, we might make stand against signing them, for I assure you that there will be no trouble in getting together."

On the 14th of April, 1905, he writes:

"In the meantime I will proceed to have the well drilled on the Sam Williams lease, and by that time you will be here, and we can enter into a definite arrangement and lay out a line of work for the summer, if we can get together."

On the 28th of April he writes:

"I will take the land of Hertzwell, as you indicated, and let you make a fair remuneration for it, and do business in any other way you may indicate; but I would prefer to take some more land, which we could have together, the same as Kemp does for. Jennings, and C. B. Fulton for Shaffer, and as many others are doing. That is, I take up the land under the terms indicated by you, you to carry me a 1-8 in all the land so taken in which we operate, you to pay me a reasonable salary and expenses. The salary is necessary for me to keep my family. The 1-8 is net after the leases have paid out. If I take the lands and you have arranged to turn them over to others, I take a 1-8 of the net profits in the deal."

On the 15th of May, 1905, he writes:

"Let me hear from you at once regarding it, as I want to do things in accordance with your pleasure and any plans you may suggest. Thus far I have been looking carefully after all the matters, and have paid all my own expenses since April 1st, and want to be able to operate matters economically and according to the best interests of the parties concerned. If you are coming out soon, you may defer any arrangement. If not, you had better arrange matters as suggested above."

It is not practicable, within any reasonable limits, to set forth the evidence in the case, even in a condensed form. It must suffice to say that the briefs and record have been carefully read, and that the evidence is exactly as stated by the referee, that is, hopelessly conflicting, and that the finding of the referee is not without reasonable support in the evidence.

Plaintiff's next contention is that the referee and court should not have adjudicated plaintiff's right under the drilling and cleaning out contracts. It is true that plaintiff did not directly raise any question as to these contracts; but he did allege that Barnsdall was threatening to remove plaintiff from his control over the property, and prayed, in effect, that Barnsdall be enjoined from removing him from the possession and control.

Barnsdall, in his answer, alleged that plaintiff was conducting the operations in an incompetent, extravagant, and negligent manner, and prayed, in effect, that plaintiff be enjoined from interfering with his possession, and also prayed for general relief. An issue was thus made up, such as vested the court with jurisdiction to cancel the drilling and cleaning out contracts, if the evidence justified it.

When Weber claimed an interest adverse to Barnsdall, to which he was not entitled, he forfeited his rights in the drilling and cleaning out contracts. An agent or employee cannot take a position antagonistic to the business interest of his employer, and continue in the employment against the will of the employer. Weber not only asserted an interest in Barnsdall's property to which he was not entitled, but, when he became general manager of the Coon Creek Oil & Gas Company, he entered into a relation naturally antagonistic to Barnsdall. See *Cotton v. Rand,* 93 Tex. 7, 51 S. W. 838, 53 S. W. 343; *Case v. Jennings,* 17 Tex. 662, 26 Cyc. 988, and cases cited in note 33. As the general manager of the Company, it was his duty to represent that Company in any controversy that might come up with Barnsdall with reference to the drilling and cleaning out of wells. He could not remain in Barnsdall's service under those conditions against Barnsdall's wishes.

Plaintiff contends, further, that the finding of the referee that the Company was not entitled to damages is erroneous.

On the 22d of July, 1907, the Company filed an answer, in which it alleged in substance that it knew nothing of the contract between Weber and Barnsdall, and alleged that it was willing at any and all times to pay over to the person entitled to receive same all the proceeds derived from the sale of oil and gas already produced, or which might thereafter be produced, under the agreement between the Company and Barnsdall, entered into September 22, 1905, that Barnsdall protested against it making any payment to Weber, and closed with the statement that it was willing that the rights of all parties be determined. There was in this answer no hint that it considered itself damaged in any way.

Afterwards, on the 10th of August, 1907, Weber was elected general manager of the Company, and a short time afterwards it filed its amended answer, alleging damages for failure to drill offset wells. The evidence shows that offset wells had been drilled on the property against all adjacent wells within 90 days after they were drilled. The contract between the Company and Barnsdall provided that Barnsdall should offset paying wells drilled within 300 feet from the line or lines of the leases. The time within which the offset wells should be drilled was not specified, and it was not proven that 90 days was not a reasonable time. As a matter of course, it was not in contemplation that the offset wells should be finished at the same time as the wells to be offset. Only paying wells were to be offset, and Barnsdall could not be expected to begin an offset well until the well to be offset had been completed. Ninety days was not such an unreasonable length of time as to make Barnsdall liable.

The contract further provided that if oil was found in paying quantities in any well, that Barnsdall should, with due diligence, drill other wells so as to fully develop the property. Weber testified that 108 wells were necessary in order to develop the property, and that they should have been completed at the time he testified in order to fully protect the property from drainage, and that by reason of the failure to drill them the adjacent wells had drained the property to the extent that the Company had been damaged in the sum of $10,000; but no other witness testifies as to these facts. The Company had made no complaint prior to the time Weber became general manager, and Geo. V. Denison, special master, had found as a fact that Weber had been in charge, developing the property, and that it had been done well and properly. Further, Weber had been in adverse possession of the property after the suit was brought.

Barnsdall made application for the appointment of a receiver; but the application was opposed by both Weber and the Company, and was denied upon the condition that both Weber and the Company give Barnsdall an indemnity bond.

The evidence and pleadings show clearly that, at least, after Weber became the general manager of the Company, that Com-

pany became his partisan and took his side of the controversy between him and Barnsdall. Barnsdall was trying to dislodge him from the possession of the property; but he was holding on with the connivance and encouragement of the Company, and was managing the property for a considerable length of time contrary to the wishes of Barnsdall. The Company cannot hold Barnsdall liable for the acts of Weber, or for his failure to act when he was proceeding adversely to Barnsdall with the connivance of the Company. Weber was in effect a receiver. It was his duty to protect the property, and if he did not the Company could have obtained, by proper showing, an order of court requiring him to protect it. Or they could have, on proper showing, obtained an order placing some one else in possession.

The evidence as to the extent of the loss is incredible. The total value of the oil lost must have been more than $160,000, if the Company's loss amounts to $10,000.. The total production of the lease was only a little more than $260,000. It cannot be that adjacent wells, most of which were offset promptly, drained the land to anything like the extent claimed.

It follows that the judgment of the lower court should be affirmed.

By the Court: It is so ordered.